**THE NIRENBERG LAW FIRM, LLC**
One University Plaza, Suite 607
Hackensack, New Jersey 07601
Tel: (201) 487-2700
Fax: (201) 487-2701
jnirenberg@njemploymentlawfirm.com
Jonathan I. Nirenberg (JIN 2954)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANNA SAC,<br><br>              **Plaintiff,**<br><br>v.<br><br>BRISTOL-MYERS SQUIBB COMPANY,<br>and KATHERINE R. KELLY,<br><br>              **Defendants.** | Civil Action No.:<br><br>**COMPLAINT &**<br>**JURY DEMAND** |

Plaintiff Anna Sac, by her attorneys, for her Complaint against Defendants Bristol-Myers Squibb Company and Katherine R. Kelly, says:

**JURISDICTION AND VENUE**

1.     The jurisdiction of the Court over this controversy is invoked pursuant to 29 U.S.C. § 2617, and 28 U.S.C. §§ 1331, 1343 and 1367(a).

2.     The Court has supplemental jurisdiction over Plaintiff's state law causes of action pursuant to 28 U.S.C. § 1367(a).

3. The unlawful employment practices described herein were committed in the District of New Jersey. Accordingly, venue lies in the United States District Court for the District of New Jersey pursuant to 28 U.S.C. §1391(b).

4. The causes of actions alleged herein seek to redress violations of the Conscientious Employee Protection Act, N.J.S.A. § 34:19-1, et seq. ("CEPA"), the Fair Labor Standards Act of 1938, 29 U.S.C. § 201, et seq. ("FLSA"), the New Jersey Wage and Hour Law, N.J.S.A. § 34:11-56, et seq. ("NJWHL"), the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, et seq. ("FMLA"), and the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1, et seq. ("LAD"), and to recover damages, costs, attorney fees and equitable relief under the CEPA, FMLA, FLSA, NJWHL, and the LAD.

## PARTIES

5. Plaintiff Anna Sac ("Ms. Sac"), an individual, resides at 26 Random Road, Princeton, New Jersey 08540.

6. Defendant Bristol-Myers Squibb Company ("BMS") is a corporation with its principal place of business at 345 Park Avenue, New York, New York 10154.

7. Defendant Katherine R. Kelly ("Kelly"), an individual, is the Vice President and Assistant General Counsel of BMS. At all relevant times, Kelly was Ms. Sac's manager and immediate supervisor.

## FACTUAL BACKGROUND

### MS. SAC OBJECTED TO DEFENDANTS FILING SEC DOCUMENTS CONTAINING MATERIALLY FALSE INFORMATION

8. On January 26, 2009, BMS hired Ms. Sac to work full-time as a paralegal.

9. On October 21, 2009, Defendant asked Ms. Sac to review the company's 10-Q and 8-K for the third quarter of 2009.

10. When she reviewed BMS's 10-Q and 8-K, Ms. Sac noticed a discrepancy between the two documents. Specifically, the 8-K states that the estimated $1.3 billion to $1.6 billion cost of the company's Productivity Transformation Initiative ("PTI") "<u>does not include</u> gains realized due to sales of assets," but the 10-Q states that the $1.3 billion to 1.6 billion cost does "<u>include</u> $231 million of gains related to the sale of mature product lines and businesses."

11. On October 21, 2009, Ms. Sac sent an email to Kelly and BMS's Corporate Finance Reporting ("CFR") Group in which she brought this discrepancy to the Group's attention.

12. On October 21, 2009, when Ms. Sac called Rimas Vaitauskas at the CFR Group to follow up regarding the misrepresentation in either the 10-Q and/or the 8-K, both of which were supposed to be filed the following day, he assured her CFR was aware of the issue and already looking into it.

13. When Ms. Sac learned that BMS had finalized its 10-Q and 8-K without correcting the error, she objected to Kelly because the misinformation could mislead BMS's shareholders, investors, and creditors.

14. In response to Ms. Sac's objection, Kelly initially indicated she was going to contact the Assistant Controller about this issue. Kelly subsequently claimed it was too late to correct this information, and that "perhaps nobody would notice" the discrepancy.

15. On December 18, 2009, Kelly reprimanded Ms. Sac because she objected to the fact that there was false information on either BMS's 10-Q and/or its 8-K, and criticized her tendency to notice things and raise them via email.

16. In or around December 2009, Ms. Sac discovered that someone had deleted her email to CFR regarding the accounting discrepancy in October 2009.

**MS. SAC OBJECTED TO DEFENDANTS' VIOLATIONS OF OVETIME LAWS**

17. From January 2009 to December 2010, Ms. Sac frequently worked in excess of 40 hours per week for Defendants.

18. Defendants failed to pay Ms. Sac overtime even though her predecessor was non-exempt and Defendants expressly described Ms. Sac's position as non-exempt when they advertised to hire her.

19. Defendants failed to inform Ms. Sac about the time recording software used by its paralegals and administrative assistants, let alone train her how to use that software.

20. In late 2009, Kelly, who is an experienced attorney, instructed Ms. Sac not to send emails after business hours, presumably so there would be no record that she was working overtime.

21. On or around November 30, 2010, Ms. Sac became aware that Defendants had incorrectly classified her as an exempt employee, and that she was entitled to overtime pay when she worked in excess of 40 hours in a workweek.

22. Defendants were reluctant to compensate Ms. Sac in full for her overtime. For example, Kelly stated that Ms. Sac would be paid overtime wages for 2010, but not for 2009, and indicated that BMS would only compensate Ms. Sac for the hours when she (Kelly) asked her to work late. Furthermore, since BMS did not track Ms. Sac's hours worked, Defendants suggested calculating her overtime pay based on the emails she sent after regular business hours.

23. On December 7, 2010, during a meeting with Kelly and Bernard Abramowitz, Director of Human Resources, Ms. Sac objected to the methods Kelly proposed using to

4

calculate her overtime pay.  For example, she explained that (1) under New Jersey Wage and Hour Law, BMS is responsible for tracking non-exempt employees' time records, and (2) she was entitled to be paid time-and-a-half for the overtime hours she worked for the company regardless of whether her manager had expressly approved the overtime.  She also objected to BMS's refusal to retrieve information reflecting the time when she used her electronic key/security badge to enter and leave the building.

### MS. SAC OBJECTED TO DEFENDANTS' OTHER VIOLATIONS OF LAW

24. On January 31, 2011, Ms. Sac objected about Kelly's false and retaliatory performance evaluation to Mark Speaker, BMS's Deputy General Counsel, Abramowitz, and Karen Johnson, BMS's Compliance Ombusdswoman.

25. In or around March 15, 2011, Ms. Sac made a formal complaint to BMS's Office of Compliance and Ethics ("Compliance") regarding Kelly's retaliatory harassment.

26. In June and August 2011, Ms. Sac made additional objections to BMS's Compliance and Human Resources Departments, explaining that Kelly had been harassing her in retaliation for her objections to Defendants' failure to properly calculate her overtime pay.

27. In or around July 25, 2011, Kelly asked Ms. Sac to shred her notes from the Disclosure Policy and Review Committee meeting on June 28, 2011.  Ms. Sac objected and refused to participate in this destruction of documents because she reasonably believed it violated the terms of the Deferred Prosecution Agreement between BMS and the United States Attorneys' Office.

28. In January and February 2012, Ms. Sac objected to BMS's Human Resources Department because she felt unsafe in the workplace due to the comments she heard Joseph Campissi, Vice President and Senior Counsel, make that presumably were about her.  Ms. Sac's

email referenced relevant Occupational Safety and Health Administration ("OSHA") rules, and inquired about the location of the mandatory Labor Law posters in the building.

### DEFENDANTS HARASSED MS. SAC IN RETALIATION FOR HER OBJECTIONS TO VIOLATIONS OF LAW

29. On December 10, 2010, Kelly called Ms. Sac to express her disappointment about Ms. Sac's objections to Defendants' overtime violations during their meeting with Abramowitz on December 7, 2010. Kelly indicated she was disappointed with Ms. Sac's "attitude and agenda," and told her "you threw me under the bus." For example, Kelly indicated that Ms. Sac should not have insisted the company provide her with information when she used her electronic key/security badge.

30. During the December 10, 2010 call, Kelly falsely claimed there had been problems with Ms. Sac's job performance.

31. During the December 10, 2010 call, Kelly also told Ms. Sac it was very difficult for her to move forward working with Ms. Sac, and warned Ms. Sac that whether they could move forward depended on how they resolved her overtime claim.

32. On December 13, 2010, Abramowitz informed Ms. Sac that she made a mistake during the December 7 meeting when she failed to admit the company's failure to pay her overtime was unintentional.

33. Defendants rejected Ms. Sac's calculation that she had worked 172 hours of overtime. Abramowitz suggested the number should be reduced to 150. Defendants ultimately paid her $8,111.25, even though it reflected only a portion of her unpaid overtime pay and did not account for the overtime she worked from February to May 2009.

34. On December 20, 2010, Ms. Sac requested three sick days without specifying the nature of her medical condition. Kelly responded that she was disappointed by Ms. Sac's request because she (Kelly) had just returned from vacation and needed paralegal support. As a result, Ms. Sac was forced to disclose that she had requested this time off because her doctor wanted her to have a biopsy.

35. Kelly further retaliated against Ms. Sac by becoming rude and abrasive in her communications with Ms. Sac accused her of serious lack of diligence for the first time.

36. On January 18, 2011, Kelly gave Ms. Sac a false and negative annual performance evaluation for 2010.

37. In comparison, Defendants rated Ms. Sac's job performance as "exceeding expectations" in her annual performance review for 2009, and gave her positive feedback in her 2010 mid-year performance review.

38. Defendants' harassment and retaliation exacerbated a medical condition Ms. Sac's had, and necessitated her taking several additional sick days.

39. Ms. Sac took a disability leave from February 1 to March 8, 2011.

40. When Ms. Sac returned from her leave, she discovered that Kelly's rude and abrasive emails from December 2010 had been deleted.

41. Defendants continued to retaliate against Ms. Sac while the company was investigating her March 2011 complaint to Compliance. For example, for the first time in three years they did not permit Ms. Sac to take vacation during Spring break, and Ms. Sac was the only employee in her Legal Group who was not invited to the group's outing in New York on June 27, 2011. Defendants also isolated Ms. Sac by excluding her from her Legal Group's farewell lunches.

42. In or around August 3, 2011, BMS completed its investigation into Ms. Sac's complaints that Kelly was retaliating against her for objecting to Defendants' overtime violations, and claimed it could not confirm her allegations.

43. On August 3, 2011, Defendants issued a false and negative mid-year performance review to Ms. Sac.

44. As a result of Defendant's harassment and retaliation, Ms. Sac's health deteriorated, and she was forced to take sick leave on August 4th and 5th, 2011.

45. In or around January 2012, there was a government investigation of BMS's Lawrenceville facility.

46. On information and belief, BMS mistakenly believed Ms. Sac was the person who blew the whistle and led to the government's investigation.

47. Starting in or around January 2012, members of BMS Legal Department became more hostile toward Ms. Sac.  For example, Joseph Campissi made a joke about "reporting managers to Compliance" in Ms. Sac's presence, forcefully kicked a file cabinet near Ms. Sac's desk, and made a shooting sound and looked at Ms. Sac while passing her desk.

## MS. SAC REQUESTED AN FMLA LEAVE

48. On or around March 5, 2012, Ms. Sac requested an FMLA leave due to anxiety and the symptoms she was experiencing as a result of thyroid disease.

49. BMS approved Ms. Sac's request for an FMLA leave.

50. Ms. Sac took an FMLA leave from March 5 to April 9, 2012.

51. Upon Ms. Sac's return from her FMLA leave on April 10, 2012, Kelly asked if she was planning to take any additional sick time.  In response, Ms. Sac stated that her doctor recommended she undergo thyroid procedure in the summer.

**DEFENDANTS UNLAWFULLY FIRED MS. SAC**

52. On April 19, 2012, BMS received a letter from the United States Securities and Exchange Commission ("SEC") questioning its accounting disclosures, including disclosures on its 8-Ks.

53. Contrary to past practice, Kelly did not ask Ms. Sac to review BMS's response to the SEC's letter, or even ask Ms. Sac to file the letter on her behalf.

54. On May 16, 2012, BMS terminated Ms. Sac's employment, effective May 30, 2012.

55. On May 16, 2012, an anonymous caller left a disturbing and harassing message of a sexual nature on Ms. Sac's voicemail at work.

## COUNT ONE
### (Retaliation in Violation of CEPA)

56. Ms. Sac repeats and re-alleges each and every allegation set forth above, as if set forth at length herein.

57. Ms. Sac objected to numerous policies and practices of BMS that she reasonably believed were unlawful, criminal, fraudulent, and/or were otherwise protected under CEPA (hereinafter "CEPA-protected activity").

58. Defendants harassed, terminated, and otherwise retaliated against Ms. Sac in retaliation for her CEPA-protected activities.

59. Defendants' retaliatory actions were severe and/or pervasive such that they changed the terms and conditions of Ms. Sac's employment with BMS.

60. Defendants' conduct constitutes retaliation in violation of CEPA.

61. As the result of BMS's retaliatory actions, Ms. Sac has suffered a loss of salary and benefits, and other actual monetary losses.

62. As a result of Defendants' retaliatory conduct, Ms. Sac has experienced, and will continue to experience, injuries including but not necessarily limited to garden variety emotional and physical distress.

63. Defendants' retaliatory actions were egregious, willful, wanton, and in reckless disregard of Ms. Sac's rights.

64. BMS's upper management, including but not limited to Defendant Kelly and Abramowitz participated in the relevant unlawful conduct.

## COUNT TWO
### (Violations of the FLSA)

65. Ms. Sac repeats and re-alleges each and every allegation set forth above, as if set forth at length herein.

66. Defendants failed to properly pay Ms. Sac overtime wages, in violation of the FLSA.

67. Defendants harassed, terminated, and otherwise retaliated against Ms. Sac because she objected to Defendants' failure to properly pay her overtime wages, in violation of the FLSA.

68. By retaliating against Ms. Sac, Defendants violated the FLSA.

69. Defendants' actions were willful as that term is defined under the FLSA.

70. As a result of Defendants' unlawful practices, Ms. Sac suffered a loss of salary and benefits.

## COUNT THREE
**(Violations of NJWHL)**

71. Ms. Sac repeats and re-alleges each and every allegation set forth above, as if set forth at length herein.

72. Defendants failed to properly pay Ms. Sac overtime wages, in violation of the NJWHL.

73. Defendants harassed, terminated, and otherwise retaliated against Ms. Sac because she objected to Defendants' failure to properly pay her overtime wages, in violation of the NJWHL.

74. By retaliating against Ms. Sac, Defendants violated the NJWHL.

75. As a result of Defendants' unlawful practices, Ms. Sac suffered a loss of salary and benefits.

76. Defendants are liable to Plaintiffs for lost wages and overtime pay, equitable relief and any other damages awarded by this court.

## COUNT FOUR
**(Disability Discrimination in Violation of the LAD)**

77. Ms. Sac repeats and re-alleges each and every allegation set forth above, as if set forth at length herein.

78. Ms. Sac had a disability and/or Defendants perceived her to be disabled within the meaning of the LAD.

79. Ms. Sac's disability and/or Defendants' perception that she had a disability was a determinative factor in Defendants' decision to fire her.

80. BMS's actions constitute disability discrimination in violation of the LAD.

81. BMS's conduct was egregious, willful, wanton and in reckless disregard of Ms. Sac's rights.

82. BMS's upper management, including but not necessarily limited to Defendant Kelly participated in the relevant unlawful conduct.

83. As the result of BMS's discriminatory actions, Ms. Sac has suffered a loss of salary and benefits, and other actual monetary losses.

84. As a result of Defendants' discriminatory conduct, Ms. Sac has experienced, and will continue to experience, injuries including but not necessarily limited to garden variety emotional and physical distress.

## COUNT FIVE
### (Violations of the FMLA)

85. Ms. Sac repeats and re-alleges each and every allegation set forth above, as if set forth at length herein.

86. Defendants harassed and terminated Ms. Sac in retaliation for taking an FMLA leave from March 5, 2012 to April 9, 2012, and/or in anticipation that she would request an FMLA leave for her medical procedure in the summer of 2012, in violation of the FMLA.

87. Defendants' actions were willful, as that term is defined under the FMLA.

88. As the result of Defendants' actions, Ms. Sac has suffered a loss of salary and benefits, and other actual monetary losses.

**WHEREFORE,** Ms. Sac seeks judgment against Defendants, awarding:

A. Reinstatement to her former position, or an equivalent one, retroactive to May 30, 2012;

B. Reinstatement of all her employment benefits, including but not necessarily limited to lost wages, salary, commissions, and employment benefits retroactive to May 30, 2012;

C. An injunction prohibiting Defendants from further violating her rights under CEPA, the FMLA, the FLSA, NJWHL and/or the LAD;

D. Compensatory damages including her lost wages, salary, and employment benefits, emotional and physical distress damages, and damages for pain and suffering;

E. Liquidated damages equal to the amount of her lost wages, salary, commissions, and employment benefits;

F. Emotional distress damages;

G. Punitive damages;

H. Pre- and post-judgment interest;

I. Reasonable costs and attorney's fees, reasonable expert witness fees and other costs incurred in litigation; and

J. Such other and further relief as this Court deems equitable and just under the circumstances.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury as to all causes so triable.

                                      **THE NIRENBERG LAW FIRM, P.C.**
                                      Attorneys for Plaintiff

Dated: July 6, 2012                By:  /s/ Jonathan I. Nirenberg
                                            Jonathan I. Nirenberg